UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

EMPLOYEES' RETIREMENT SYSTEM OF
RHODE ISLAND, Individually and on Behalf
of All Others Similarly Situated,

                        Plaintiff,

      vs.

BANK OF NOVA SCOTIA, NEW YORK
AGENCY; BMO CAPITAL MARKETS
CORP.; BNP PARIBAS SECURITIES CORP.;
BARCLAYS CAPITAL INC.; CANTOR
FITZGERALD & CO.; CITIGROUP
GLOBAL MARKETS INC.;
COUNTRYWIDE SECURITIES
CORPORATION; CREDIT SUISSE
SECURITIES (USA) LLC; DAIWA
CAPITAL MARKETS AMERICA INC.;
DEUTSCHE BANK SECURITIES INC.;
GOLDMAN, SACHS & CO.; HSBC
SECURITIES (USA) INC.; JEFFERIES LLC;
J.P. MORGAN SECURITIES LLC; MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; MIZUHO SECURITIES
USA INC.; MORGAN STANLEY & CO.
LLC; NOMURA SECURITIES
INTERNATIONAL, INC.; RBC CAPITAL
MARKETS, LLC; RBS SECURITIES INC.;
SG AMERICAS SECURITIES, LLC; TD
SECURITIES (USA) LLC and UBS
SECURITIES LLC,

                     Defendants.

——————————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL ANTITRUST LAWS AND
COMMODITY EXCHANGE ACT

DEMAND FOR JURY TRIAL

Plaintiff Employees' Retirement System of Rhode Island ("plaintiff" or "ERSRI"), individually and on behalf of a Class (defined below) of all others similarly situated who transacted in U.S. Treasury securities, and derivatives based on such securities, with one or more of the defendants (defined below) during the period January 1, 2008 to June 8, 2015 ("Class Period"), brings this class action for violations of the Sherman Act and the Commodity Exchange Act, to remedy breaches of the implied covenant of good faith and fair dealing and for unjust enrichment. Defendants are the primary dealers designated to trade in U.S. Treasury securities.  Plaintiff seeks actual damages, treble damages, injunctive relief, pre- and post-judgment interest and other relief as detailed below.   Based on counsel's investigation, research and review of publicly available documents and press reports, on government and regulatory investigations, including by the United States Department of Justice ("DOJ"), on plaintiff's personal knowledge, and upon information and belief, plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      This action concerns defendants' collusion in and manipulation of the market for U.S. Treasury securities, including Treasury bills, notes, bonds, Treasury Inflation-Protected Securities and floating rate notes (collectively, "Treasury Securities"), and derivative instruments based on such securities, including U.S. Treasury futures and options (collectively, "Treasury Instruments"). Treasury Securities are debt obligations issued by the U.S. government and are sold through regular auctions with maturities ranging from a few weeks to 30 years.  With over $12 trillion in Treasury Securities outstanding, the Treasury Securities market is the largest, most liquid and active bond market in the world.  It is also considered the most easily traded and trusted debt in the world, serving as the primary means of financing the U.S. federal government, a significant investment instrument and hedging vehicle for investors, and a "risk-free" benchmark for other financial

instruments.[1]  Treasury bonds, for example, are a major component of many pension plans and 401(k) investments.  Safe and efficient trading of U.S. debt is therefore essential for the United States Department of the Treasury ("Treasury Department") to borrow at the lowest possible cost.

2.      Unlike other markets, however, while the Treasury Department and Federal Reserve Bank of New York ("New York Fed") exercise some oversight of Treasury Securities, there is no central authority charged with policing the market to prevent illegal trading.  As one White House spokesman remarked, "[n]o one is" a regulator of Treasury Securities.[2]  This lack of policing is particularly concerning given the significant changes in the Treasury Securities market structure over the years.  A University of Houston finance professor recently commented that "[i]t is rather remarkable that the Fed and Treasury have taken little interest in the dramatic change in market microstructure and trading technology [of Treasuries]."[3]

3.      One such change is the significant decrease in the number of primary dealers authorized to trade in Treasury Securities with the New York Fed.  In 1988, there were 46 primary dealers.  Today there are only 22, including each of the defendants.  Not surprisingly, these dealers have been characterized as an oligopoly and "cartel of bond-market dealers [that] . . . have a privileged position in the market to purchase U.S.-government debt securities."[4]  This, in turn, "reduces competition in bond auctions, and raises costs for taxpayers and investors," but gives the

---

[1]  Joint Staff Report, *The U.S. Treasury Market on October 15, 2014* 1 (July 13, 2015), http://www.treasury.gov/press-center/press-releases/Documents/Joint_Staff_Report_Treasury_10-15-2015.pdf.

[2]  Matthew Leising, *Why the Treasury Market Needs a Lifeguard*, Bloomberg, Dec. 11, 2014, http://www.bloomberg.com/bw/articles/2014-12-11/why-the-treasury-market-needs-a-lifeguard.

[3]  *Id*. at 2.

[4]  Thomas  G.  Donlan,  *The  Capo  of  Cartels*,  Barron's,  May  18,  2009, http://online.barrons.com/articles/SB124242706194525305?tesla=y.

dealers "a bite of profit from buying and reselling Treasury issues."[5]  The small number of participants in combination with high sales volume provides "'a fertile area for harmful collusive behavior.'"[6]

4.     Defendants, acting as primary dealers, submit bids to the Treasury Department on behalf of clients and themselves as part of the purportedly competitive auction process for newly issued Treasury Securities.  The bids that defendants submit to the Treasury Department are supposed to reflect the lowest rate, yield, or discount margin (depending on the type of Treasury security) at which the bidder would agree to purchase the offered Treasury Securities.  Defendants' customers, in turn, funnel orders to them.  These confidential client orders provide defendants with valuable market intelligence, including details about pricing and volume demand for Treasury Securities that is unavailable to other traders.

5.     In a competitive market untainted by manipulation, defendants would compete with each other as primary dealers in Treasury Securities auctions such that supply and demand would shape the prices set for newly issued Treasury Securities as a result of an independent and competitive auction bidding process.  In violation of the Sherman Act and Commodity Exchange Act, however, defendants used both their privileged position as primary dealers and related access to extensive market-sensitive information to collude in and manipulate Treasury Department auctions, as well as the pricing of Treasury Securities in the "when-issued market," *i.e.*, the period between the auction announcement date and the delivery of the auctioned securities (the settlement date, or date

---

[5]     *Id.*

[6]     Alexandra Scaggs, Daniel Kruger & Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, Bloomberg, June 23, 2015, http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries.

when issued), in the secondary market for Treasury Securities and in the market for Treasury Instruments, including Treasury futures and options.

6.      Defendants were in a position to participate in the scheme because traders at the defendant banks had the opportunity to, *inter alia*, "see orders flowing in" and "learn specifics of . . . bids hours ahead of the auctions."[7] Defendants accomplished their scheme by using online chat rooms and other electronic and telephonic means in the hours before Treasury auctions to exchange confidential and market-sensitive customer information, including pricing and demand, and coordinate trading strategies in an effort to drive the prices of Treasury Securities and Treasury Instruments in a direction that would benefit their positions at the expense of ordinary investors, including plaintiff and Class members. Indeed, *Bloomberg* recently confirmed that traders at some of the primary dealers "have talked with counterparts at other banks via online chatrooms" and "swapped gossip about clients' Treasury orders."[8]

7.      Defendants leveraged this collusively exchanged information regarding, *inter alia*, auction demand and coordinated trading strategies to manipulate the markets for Treasury Securities and Treasury Instruments by: (1) submitting optimized bids to artificially depress Treasury auction prices and therefore artificially inflate the auction yields and discount rates resulting from such auctions; and (2) "front-running" or trading ahead of other investors in the when-issued and secondary markets for Treasury Securities and in the market for Treasury Instruments, in order to improve defendants' trading positions to the detriment of other market participants, including plaintiff and Class members.

---

[7]     *Id.*

[8]     *Id.*

8.     Through their unlawful conduct, defendants sought to and did reduce or eliminate their exposure to trading risk and improve their positions in Treasury auctions and the when-issued and secondary markets for Treasury Securities and in Treasury Instruments such as Treasury futures and options traded on the Chicago Board of Trade.  As a result of defendants' conduct, plaintiff and members of the Class paid more for Treasury Securities and Treasury Instruments than they would have absent defendants' collusive and manipulative scheme.

9.     On June 8, 2015, the *New York Post* reported that the DOJ was investigating possible fraudulent manipulation in the Treasury market.[9]  As part of the inquiry, the DOJ sent requests for information to at least three primary dealers, focusing on the secretive Treasury auction process. Although in its early stages, the DOJ's investigation of the Treasury market reportedly grew out of its investigations into anticompetitive conduct in various financial markets and benchmarks, including LIBOR, ISDAFix and the foreign exchange market, where regulators have uncovered extensive evidence of information-sharing through electronic chat rooms and other means.  In fact, as part of a settlement with Barclays regarding the bank's attempted manipulation of the ISDAFix benchmark, regulators have uncovered specific evidence of bidding, offering, and/or executing trades in U.S. Treasury securities to effectuate Barclays' manipulation.  Several defendants, their parents, or affiliates have paid fines or pleaded guilty to criminal charges in these investigations, including Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, RBS, and UBS (as defined below).

10.     Plaintiff brings this action for claims arising under the federal antitrust and commodity exchange laws to recover damages, injunctive relief and other relief for the substantial injuries it and others similarly situated have sustained as a result of defendants' unlawful conduct to

---

[9]     Kevin Dugan, *Justice Department probes banks for rigging Treasuries market*, N.Y. Post, June 8, 2015, http://nypost.com/2015/06/08/department-of-justice-market/.

restrain competition in the markets for Treasury Securities and Treasury Instruments in the United States during the Class Period.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1337(a), and pursuant to §§4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26), §22 of the Commodity Exchange Act (7 U.S.C. §25).

12.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22 and 28 U.S.C. §1391(b), (c) and (d) because during the Class Period all defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

13.     Each defendant is subject to personal jurisdiction because each transacted business throughout the United States, including in this District, including by transacting in Treasury Securities and/or Treasury Instruments with Class members throughout the United States and in this District; and/or committed overt acts in furtherance of their illegal conspiracy in the United States. Additionally, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and plaintiff's claims arise out of defendants' conduct.

14.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and did, in fact, have a substantial effect on the foreign and interstate commerce of the United States.  During the Class Period, defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal conspiracy.

## PARTIES

**Plaintiff**

15.     Plaintiff Employees' Retirement System of Rhode Island is a governmental defined-benefit plan with a principal address of 50 Service Avenue, Warwick, Rhode Island.  As of June 30, 2014, plaintiff ERSRI managed over $8 billion in assets on behalf of thousands of beneficiaries associated with the State of Rhode Island, including active and retired public employees and their dependents.  ERSRI directly transacted in Treasury Securities and Treasury Instruments with one or more of the defendants.  As a direct and proximate result of defendants' collusive and manipulative activities, plaintiff was injured in its business or property.

**Defendants**

16.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is a New York-based branch of a Canadian financial services and banking company with its principal place of business at 250 Vesey Street, New York, New York 10080.  During the Class Period, BNS served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

17.     Defendant BMO Capital Markets Corp. ("BMO") is a New York-based financial services and banking company with its principal place of business at 3 Times Square, 28th Floor, New York, New York 10036.  BMO operates as a subsidiary of BMO Financial Corp. During the Class Period, BMO served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

18.     Defendant BNP Paribas Securities Corp. ("BNP Paribas") is a New York-based financial services company with its principal place of business at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas operates as a subsidiary of BNP Paribas North America Inc.  During

the Class Period, BNP Paribas served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

19.     Defendant Barclays Capital Inc. ("Barclays") is a New York-based financial services company with its principal place of business at 745 Seventh Avenue, New York, New York 10019. Barclays operates as a subsidiary of Barclays Group US, Inc. During the Class Period, Barclays served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

20.     Defendant Cantor Fitzgerald & Co. ("Cantor Fitzgerald") is a New York-based financial services company with its principal place of business at 499 Park Avenue, New York, New York 10022.  Cantor Fitzgerald operates as a subsidiary of Cantor Fitzgerald LP.  During the Class Period, Cantor Fitzgerald served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

21.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York-based financial services company with its principal place of business at 390-388 Greenwich Street, New York, New York 10013.  Citigroup operates as a subsidiary of Citigroup Financial Products Inc. During the Class Period, Citigroup served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

22.     Defendant Countrywide Securities Corporation ("Countrywide") is a financial services company with its principal place of business at 4500 Park Granada, Calabasas, California 91302.  Countrywide operates as a subsidiary of Countrywide Capital Markets, LLC, which in turn operates as a subsidiary of Bank of America Corporation.  During the Class Period, Countrywide served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

23.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a New York-based financial services company with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010.  Credit Suisse operates as a subsidiary of Credit Suisse (USA), Inc.  During the Class Period, Credit Suisse served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

24.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York-based financial services company with its principal place of business at Financial Square, 32 Old Slip, New York, New York 10005.  Daiwa operates as a subsidiary of Daiwa Capital Markets America Holdings Inc.  During the Class Period, Daiwa, formerly known as Daiwa Securities America Inc., served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

25.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a New York-based investment bank with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005.  Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation.  During the Class Period, Deutsche Bank served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

26.     Defendant Goldman, Sachs & Co. ("Goldman") is a New York-based financial services company with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282.  Goldman operates as a subsidiary of The Goldman Sachs Group, Inc.  During the Class Period, Goldman served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

27.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a New York-based investment banking firm with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018.  HSBC operates as a subsidiary of HSBC Investments (North America) Inc. During the Class Period, HSBC served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

28.     Defendant Jefferies LLC ("Jefferies") is a New York-based financial services company with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022.  Jefferies operates as a subsidiary of Jefferies Group LLC.  During the Class Period, Jefferies, including its predecessor in interest Jefferies & Company, Inc., served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

29.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a New York-based financial services company with its principal place of business at 277 Park Avenue, New York, New York 10172.  JPMorgan operates as a subsidiary of JPMorgan Chase & Co.  During the Class Period, JPMorgan, including its predecessors in interest J.P. Morgan Securities Inc. and Bear, Stearns & Co., served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

30.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a New York-based financial services company with its principal place of business at One Bryant Park, New York, New York 10036.  Merrill Lynch operates as a subsidiary of BAC North America Holding Company.  During the Class Period, Merrill Lynch, including its predecessor in interest Merrill Lynch Government Securities Inc. and Banc of America Securities LLC, served as a primary

dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

31.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a New York-based financial services company with its principal place of business at 320 Park Avenue, 12th Floor, New York, New York 10022.  Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd.  During the Class Period, Mizuho served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

32.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a New York-based financial services company with its principal place of business at 1585 Broadway, New York, New York 10036.  Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc. During the Class Period, Morgan Stanley, including its predecessor in interest Morgan Stanley & Co. Incorporated, served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

33.     Defendant Nomura Securities International, Inc. ("Nomura") is a New York-based financial services company with its principal place of business at 309 West 49th Street, Worldwide Plaza, New York, New York 10019.  Nomura operates as a subsidiary of Nomura Holding America, Inc.  During the Class Period, Nomura served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

34.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian financial services company with its principal place of business at Royal Bank Plaza, 200 Bay Street, Toronto, Ontario, Canada ON M5J 2W7.  RBC also maintains offices at 3 World Financial Center, 200 Vesey Street, 8th Floor, New York, New York 10281 and at One Liberty Plaza, 165 Broadway, New York, New

York 10006.  RBC operates as a subsidiary of RBC USA Holdco Corporation.  During the Class Period, RBC, including its predecessor in interest RBC Capital Markets Corporation, served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

35.    Defendant RBS Securities Inc. ("RBS") is a Connecticut-based financial services company with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901.  RBS operates as a subsidiary of RBS Holdings USA Inc.  During the Class Period, RBS served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

36.    Defendant SG Americas Securities, LLC ("SG") is a New York-based financial services company with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020.  SG operates as a subsidiary of SG Americas Securities Holdings, LLC, which itself is a subsidiary of Societe Generale Group.  During the Class Period, SG served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

37.    Defendant TD Securities (USA) LLC ("TD Securities") is a New York-based financial services company with its principal place of business at 31 West 52nd Street, New York, New York 10019.  TD Securities operates as a subsidiary of TD Holdings II Inc.  During the Class Period, TD Securities served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

38.    Defendant UBS Securities LLC ("UBS") is a Connecticut-based financial services company with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901.  UBS operates as a subsidiary of UBS Americas Inc.  During the Class Period, UBS served

as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

39.     Defendants BNS, BMO, BNP Paribas, Barclays, Cantor Fitzgerald, Citigroup, Countrywide, Credit Suisse, Daiwa, Deutsche Bank, Goldman, HSBC, Jefferies, JPMorgan, Merrill Lynch, Mizuho, Morgan Stanley, Nomura, RBC, RBS, SG, TD Securities and UBS are collectively referred to herein as "Defendants."

40.     Various other non-parties unknown to plaintiff at this time also participated as co-conspirators, performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to identify other co-conspirators and to name subsequently some or all co-conspirators, whether identified here or not, as defendants.

## FACTUAL ALLEGATIONS

### Treasury Securities

41.     Treasury Securities are debt obligations of the U.S. government issued by the Treasury Department to raise money to finance the public deficit and are backed by the "full faith and credit" of the U.S. government.  They are used for investing and hedging purposes and because they are considered to be free of default risk they serve as a benchmark for pricing other types of assets.  The Treasury Department sells different types of Treasury Securities, including bills (also known as T-Bills), notes, bonds, Treasury Inflation-Protected Securities ("TIPS"), and more recently, floating rate notes ("FRNs").

42.     Treasury bills are short-term government securities with maturities ranging from a few days to 52 weeks.  T-Bills are sold at a price less than or equal to their par (face) value, and when they mature they pay their par value.  The return to the investor is the difference between the purchase price of the security and what is paid at maturity (or what it sells for if it is sold before it

matures), known as the discount rate.  For example, if an investor bought a $10,000, 26-week Treasury bill for $9,750 and held it until maturity, the interest would be $250.

43.    Treasury notes and bonds are securities that pay a fixed rate of interest every six months until the security matures, which is when they pay the par value, and are issued as "coupon" securities.  The only difference between notes and bonds is their length until maturity.  Treasury notes are issued with maturities of 2, 3, 5, 7, and 10 years while Treasury bonds mature in 30 years.

44.    TIPS are marketable securities whose principal is adjusted to reflect inflation or deflation as measured by the U.S. Department of Labor's Consumer Price Index.  TIPS pay interest every six months and are issued with maturities of 5, 10, and 30 years.

45.    An FRN is a security that has an interest payment that can change over time. FRNs are currently offered in only a 2-year maturity and pay a quarterly coupon that is indexed to the most recent 13-week Treasury bill offering.  Therefore, coupon or interest payments of an FRN will increase when interest rates increase and decrease when interest rates decrease.

**Treasury Auctions and the "When-Issued" Market**

46.    Approximately two-thirds of the nation's multi-trillion dollar debt is held in Treasury bills, notes, bonds or other Treasury Securities.  The Treasury Department sells these securities in the primary market at sealed-bid auctions through the Treasury Automated Auction Processing System (TAAPS), an application that provides direct access to U.S. Treasury auctions.  Investors without access to TAAPS can bid through broker-dealers or depository institutions with access to TAAPS.  The largest group of buyers at the auctions are primary dealers, including Defendants, who are required to bid a minimum specified amount in every Treasury auction.  This amount is determined as the total offering amount divided by the number of primary dealers.[10]  Other auction

---

[10]    For example, with 22 primary dealers, each dealer would be required to bid approximately $454,545,454 ($10,000,000,000 / 22) on a $10 billion offering.

participants include investment funds, pensions and retirement funds, insurance companies, foreign accounts, non-profit organizations and others.  A much smaller volume of securities is purchased by individual investors who buy them directly from the Treasury Department.

47.   The modern auction process for Treasury Securities begins with a public announcement by the Treasury Department.  The announcements are generally released several days before an auction.  An auction announcement will contain certain information, including the amount of the security the Treasury Department is selling, auction date, issue date, original issuance date (in the case of a reopening), maturity date, terms and conditions of the offering, customers eligible to participate, bidding close times and any additional pertinent information.

48.   Treasury auctions are generally held at regular intervals according to the following schedule:[11]

| | |
|---|---|
| 4-week bills | Weekly (Tuesdays) |
| 13-week and 26-week bills | Weekly (Mondays) |
| 52-week bills | Every 4 weeks (Tuesdays) |
| 2-year notes | Monthly (End of month) |
| 3-year notes | Monthly (Middle of month) |
| 5-year notes | Monthly (End of month) |
| 7-year notes | Monthly (End of month) |
| 10-year notes | Monthly (Middle of month) |
| 30-year bonds | Monthly (Middle of month) |
| 5-year TIPS | Three times per year (Apr, Aug, Dec) |
| 10-year TIPS | Bimonthly (Jan, Mar, May, Jul, Sep, Nov) |
| 30-year TIPS | Three times per year (Feb, Jun, Oct) |
| 2-year FRN | Monthly (End of month) |

---

[11]   Fed. Reserve Bank of N.Y., *Treasury Auctions*, http://www.newyorkfed.org/aboutthefed/fedpoint/fed41.html.

49.     Bids are accepted immediately after the announcement of a security and are submitted electronically through TAAPS.  All bids are supposed to be confidential and can be submitted in two types: non-competitive and competitive.  Non-competitive bids are generally submitted by small investors and individuals and are guaranteed to receive the requested securities.  The amount of securities that may be sold to a single non-competitive bidder is limited to $5 million per auction.  Non-competitive bidding typically closes at 11:00 a.m. for bills and FRNs and 12:00 p.m. for notes, bonds, and TIPS on the day of the auction (Eastern Time).

50.     As soon as it stops receiving non-competitive bids, the Treasury Department announces the amount available to competitive bidders after all non-competitive bid amounts are subtracted from the total offering amount.  The total amount of non-competitive bids is small compared to the total offering amount – in 2013, non-competitive awards represented around 2.05%, 0.21%, and 0.29% of the total offering amounts for bills, TIPS, and nominal coupons (notes and bonds), respectively.

51.     Competitive bids are usually submitted by large financial institutions, including the primary dealers, for their own accounts or on behalf of customers. Bids are submitted in terms of yield (for coupon-bearing securities such as notes and bonds) or discount rate (for bills) quantity pairs, stated in three decimal places.[12]  To ensure that the secondary market for Treasury Securities remains competitive, bidders are restricted to receiving no more than 35% of the total amount of securities available to the public.  Many of the Treasury Securities bought by Defendants are later sold and resold on the secondary market to companies, banks, other dealers and individuals.  Given their large bid sizes, primary dealers, including Defendants, often submit their "competitive" bids at

---

[12]    For example, a primary dealer might bid 2.998% (the yield) for $3.5 billion (the amount) of 2-year Treasury notes – the yield representing the return on investment, expressed as a percentage, on the U.S. government's debt obligation. In other words, the Treasury yield is the interest rate the U.S. government pays to borrow money for different lengths of time.

the last possible moment, sometimes literally seconds before the auction closes.  Competitive

bidding typically closes at 11:30 a.m. for bills and FRNs and 1:00 p.m. for notes, bonds, and TIPS

on the day of the auction (Eastern Time).

52.     Once the auction is completed, TAAPS processes all the bids received and determines

the auctions' winning price.  It does so by first subtracting the non-competitive bids from the

offering amount to determine the amount of securities available to competitive bidders, and then

working its way down the list of competitive bids and accepting the total amount submitted at the

lowest possible bid yields until the full offering amount of the auction has been awarded.  This is

consistent with the notion that Treasury auctions are designed in order to minimize the cost of

financing the national debt.

53.     To illustrate, in a competitive auction offering for $20 billion in 2-year notes, the

following bids may be made:

| Name | Yield | Amount |
|------|-------|--------|
| Bidder 1 | .598% | $9 billion |
| Bidder 2 | .599% | $5 billion |
| Bidder 3 | .600% | $4.5 billion |
| Bidder 4 | .600% | $4.5 billion |
| Bidder 5 | .601% | $2.5 billion |

54.     The TAAPS system will accept the total amount submitted at the lowest bid yields

until the full offering amount has been awarded as follows:

| | |
|---|---|
| Competitive Offering | $20,000,000,000 |
| Bidder 1 @ .598% (lowest yield) | - $9,000,000,000 |
| **Remaining Competitive Offering** | **$11,000,000,000** |

- 17 -

| Bidder 2 @ .599% (next lowest) | - $5,000,000,000 |
|---|---|
| **Remaining Competitive Offering** | **$6,000,000,000** |

55.     At this point there is $6 billion remaining for competitive bidding.  However, there are a total of $9 billion in bids at the next lowest rate (.600%).  The highest accepted rate (.600%) is known as the stop-out rate or yield.  When this occurs, each bidder at this rate is awarded a percentage of their total bid amount calculated by dividing the remaining competitive offering by the total amount bid at the stop-out rate, which in this instance would amount to 66.67% ($6,000,000,000 / $9,000,000,000).   In this example, bidders 3 and 4 would receive a partial allocation of approximately $3 billion (66.67% X $4.5 billion bid).

56.     The Treasury Department sells its securities to the public through single-price auctions, meaning both successful competitive bidders and non-competitive bidders buy securities at a price that equals the highest accepted rate regardless of the rate or yield they submitted.  Therefore, in the example above, the notes would be awarded at the .600% stop-out rate as follows:

| Name | Yield | Amount Bid | Amount Awarded | Allocation Percentage | Rate Awarded |
|---|---|---|---|---|---|
| Bidder 1 | .598% | $9 billion | $9 billion | 100% | .600% |
| Bidder 2 | .599% | $5 billion | $5 billion | 100% | .600% |
| Bidder 3 | .600% | $4.5 billion | $3 billion | 66.67% | .600% |
| Bidder 4 | .600% | $4.5 billion | $3 billion | 66.67% | .600% |
| Bidder 5 | .601% | $2.5 billion | $0 | 0% | N/A |

57.     For certain Treasury Securities, there are "re-openings" in which the Treasury Department issues additional amounts of a previously issued Treasury security.  The reissued

security has the same maturity date and coupon interest rate as the original security, but with a different issue date and usually a different purchase price.

58.     Upon completion of the auction, the most recently issued bill, note, or bond becomes "on the-run" and the previous on-the-run issue becomes "off-the-run" upon the issue of the new Treasury Securities.  Both on-the-run and off-the-run trading occurs in the secondary Treasury market.  In general, on-the-run securities tend to be more liquid than off-the-run securities of comparable maturity.

59.     There is also a forward market for Treasury Securities which is tied to Treasury auctions.  Once the auction is announced, the primary dealers begin trading, for themselves and for their institutional clients, forward contracts on the securities to be auctioned.  As the securities are to be delivered "when issued," this forward market is usually referred to as the "when-issued" market. After the auction, trading continues in the when-issued market until the when-issued contracts mature and are delivered, subsequent to which the securities are traded in the secondary market.[13]

60.     The when-issued market serves as a price discovery mechanism that allows participants to gauge the demand for an issue of Treasury Securities, and also provides primary dealers with the opportunity to sell Treasury Securities prior to having to purchase them in the auction.  Prior to the auction, when-issued securities are sometimes viewed as bets on what the ultimate auction price will be.  By reducing uncertainty, when-issued trading allows competitive bidders to bid more confidently and aggressively.  Defendants, as primary dealers, dominate the when-issued market.

61.     Treasury auctions are designed to minimize the cost of financing the national debt through when-issued trading, competitive bidding in auctions and a liquid secondary market.

---

[13]   Securities trade on a "when-issued" basis when they have been announced, but not yet issued. The transaction is settled only after the security has been issued.

**The Secondary Market and Treasury Derivatives**

62.    The trading of already-issued on-the-run and off-the-run Treasury Securities by investors and primary market participants constitutes the secondary market.  Primary dealers act as market makers in the secondary market, with standing bid/offer quotes, which functions as an over-the-counter market trading system where parties trade Treasury Securities directly with each other as opposed to on an exchange.  Prices in the secondary market for Treasury Securities are impacted by supply and demand, changes in interest rates, and the prices and yields resulting from auctions of newly issued Treasury Securities.

63.    A dealer in the secondary market for Treasury Securities makes money through the spread – the difference between the bid price (what the dealer is willing to pay for a security) and the ask price (the price at which the dealer is willing to sell the security).

64.    The secondary market for Treasury Securities is highly efficient, with yields and prices quickly reflecting their fundamental values given the available public mix of information.

65.    In addition to trading in the secondary market, Treasury Securities form the basis of several Treasury Instruments, including futures and options that are traded extensively on the Chicago Board of Trade ("CBOT") exchange through CME Group's electronic trading platform, CME Globex.  Treasury futures were originally introduced in 1977 on the CBOT, which merged with the Chicago Mercantile Exchange ("CME) in 2007 and now operates as a unit of CME Group Inc.

66.    Treasury futures and options are available to trade on the CBOT from 5 p.m. to 4 p.m. Central Time the following day, Sunday through Friday, and allow investors to profit from anticipated changes in interest rates and hedge exposure to changes in interest rates.

67.    Market participants can transact in the following Treasury futures available on the CBOT: 2-year and 3-year Treasury Note Futures (representing a contract for delivery of a 2-year or

3-year Treasury Note, respectively, with a face value of $200,000); 5-year and 10-year Treasury Note Futures (representing a contract for delivery of a 5-year or 10-year Treasury Note, respectively, with a face value of $100,000); and Treasury Bond and Ultra Treasury Bond Futures (representing a contract for delivery of a Treasury Bond with a face value of $100,000).

68.     Market participants can transact in the following Treasury options available on the CBOT: 2-year, 5-year and 10-year Treasury Note Options (representing a contract for delivery of a 2-year, 5-year or 10-year Treasury Note Futures contract, respectively); T-Bond Options (representing a contract for delivery of a Treasury Bond Futures contract); and Ultra T-Bond Options (representing a contract for delivery of an Ultra Treasury Bond Futures contract).

69.     Prices are "tightly linked" across the secondary market trading of cash Treasury Securities and the market for futures and options on Treasury Securities.[14]

### The Lack of Oversight of the Treasury Securities Market Provided "Fertile" Ground for Defendants to Engage in Collusive and Manipulative Behavior

70.     There is minimal oversight over the Treasury Securities market and auction process. Not since the late 1990s have "regulators [taken] a hard look at how Wall Street trades Treasuries."[15] In fact, "[n]o single regulator in th[e] $12.3 trillion market has the authority or expertise to assess evidence of illicit practices."[16]   While the Treasury Department has the authority to write rules regarding Treasury Securities trading, it does not enforce them.   Responsibility to enforce these regulations as they apply to the cash market generally falls to the Securities and Exchange

---

[14]   Joint Staff Report, *supra* note 1, at 2.

[15]   Matthew Leising, *If Treasuries Are Manipulated, Good Luck Finding Any Cops*, Bloomberg, Dec. 8, 2014, http://www.bloomberg.com/news/articles/2014-12-08/light-speed-treasury-trading-governed-by-rules-dating-to-1998.

[16]   *Id.*

Commission ("SEC"), and regulation of the trading of Treasury futures and options falls to the Commodity Futures Trading Commission ("CFTC").

71.     Indeed, one White House spokesman remarked that "[n]o one is" a regulator of Treasury Securities.[17] Similarly, a University of Houston finance professor recently commented that "[i]t is rather remarkable that the Fed and Treasury have taken little interest in the dramatic change in market microstructure and trading technology [of Treasuries]."[18] Given the small number of participants and high sales volume, *Bloomberg* has reported that the U.S. Treasury market "'is a fertile area for harmful collusive behavior.'"[19] This disorganization, limited oversight and lack of enforcement provided Defendants a prime opportunity to employ their collusive and manipulative scheme.

**Standards and Best Practices Governing Primary Dealers**

72.     Defendants, as primary dealers, are the largest participants in Treasury Securities auctions and are active participants in the trading of Treasury Securities in general. Given their ability to bid on behalf of themselves and indirect bidders, primary dealers, unlike other participants in the Treasury Securities markets, are uniquely situated to see large amounts of order flow and estimate demand for any given issuance at a Treasury Department auction.

73.     In a revised policy addressing the business standards expected of primary dealers, the New York Fed instructed that dealers' "bid rates should be reasonable when compared to the range of rates in the market, taking into account market volatility and other risk factors."[20] The policy also

---

[17]   Matthew Leising, *Why the Treasury Market Needs a Lifeguard*, *supra* note 2.

[18]   *Id.* at 2.

[19]   Scaggs et al., *supra* note 6.

[20]   Fed Reserve Bank of N.Y., *Operating Policy: Administration of Relationships with Primary Dealers* (Jan. 11, 2010), http://www.newyorkfed.org/markets/pridealers_policies.html.

states that the New York Fed expects "primary dealers to act as responsible counterparties and market participants in their overall conduct and support of market efficiency and liquidity. As an example, the New York Fed expects its counterparties to have implemented the Treasury Market Best Practices published by the Treasury Market Practices Group (TMPG) . . . ."[21]

74.    The TMPG is an industry group sponsored by the New York Fed consisting of various members, including representatives from several primary dealer Defendants, including Barclays, Citigroup, Goldman, JPMorgan, Morgan Stanley, and until recently, HSBC. The TMPG's *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets* ("*Best Practices*") and *Automated Trading in Treasury Markets* publications purport to "represent[] the views of the private sector members" only.[22]

75.    The TMPG, including the defendant members, updated its *Best Practices* guidelines in June 2015 to "promote the integrity and efficiency" of the Treasury market.[23] In the guidelines, the TMPG lists certain practices to avoid, including "those that give a false impression of market price, depth or liquidity."[24] Such strategies include

> those that may cause undue latency, artificial price movements, or delays in other participants' executions and result in a false impression of market price, depth, or liquidity. Manipulative practices, including those in which a trader enters a bid or offer with the intent to cancel the bid or offer before execution (such as "spoofing" or

---

[21]    *Id.*

[22]    *E.g.*, Treasury Market Practice Group, *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets* 7 (June 2015), http://www.newyorkfed.org/tmpg/TPMG_June%202015_Best%20Practices.pdf.

[23]    Press Release, Treasury Market Practices Group, *TMPG Releases Updated Best Practice Guidance to Address Automated Trading* (June 10, 2015), http://www.newyorkfed.org/tmpg/TMPG_June%2010%202015_Press%20release.pdf

[24]    *Best Practices*, *supra* note 22, at 2.

"layering"), "painting the tape," and improper self-trading, may also create a false sense of market price, depth or liquidity and should be avoided.[25]

The *Best Practices* also included an updated recommendation that "[m]arket participants employing trading strategies that involve high trading volume or quoting activity should be mindful of whether a sudden change in these strategies could adversely affect liquidity in the Treasury . . . market[], and should seek to avoid changes likely to cause such disruptions."[26]  In addition to the guidelines, market participants are urged to "not engage in illegal activities such as price manipulation."[27]

76.     Defendants understood their crucial role in the proper functioning of the Treasury markets, and through the *Best Practices* guidelines Defendants intended to ensure that they operated in accordance with certain principles.  Despite being aware of this role, however, Defendants leveraged their special position as primary dealers and market makers for Treasury Securities and Treasury Instruments to manipulate the Treasury markets to their benefit and to the detriment of others, including plaintiff and Class members.

**Defendants Are Direct Competitors in the Markets
for Treasury Securities and Treasury Instruments**

77.     Defendants compete with each other directly in both the Treasury Securities and Treasury Instruments markets as primary dealers, market makers, and direct market participants. Defendants compete with each other as primary dealers bidding on behalf of clients and on behalf of themselves in Treasury Securities auctions and in the when-issued market, as market makers in the secondary market for Treasury Securities and as traders of related Treasury Instruments.  For example, Defendants compete against each other as direct market participants in the secondary

---

[25]   *Id.*

[26]   *Id.*

[27]   *Id.*

market for on-the-run and off-the-run Treasury Securities by seeking to maximize profits from bid-ask spreads, and in the market for Treasury Instruments by seeking to maximize profits from using futures and options to take net-long and net-short positions in the Treasury Securities market.

78.     Under normal competitive circumstances and absent collusion and manipulation, Defendants would seek to attain the best price in Treasury auctions while their trading positions, and corresponding profits or losses, would be determined through competition with other primary dealer Defendants.  Consequently, competition among Defendants would contribute to the efficiency of Treasury auctions, the secondary market for Treasury Securities and the market for Treasury Instruments.  Defendants' collusion and manipulation, however, stifled competition and created artificial and manipulated markets.

**Defendants Colluded to Manipulate the Prices of**
**Treasury Securities and Treasury Instruments**

79.     In early June 2015 it was reported that the DOJ was "looking into possible fraudulent manipulation of the $12.5 trillion Treasurys market."[28]  The report stated that the probe focused on Treasury auctions and that the government requested information from three of the defendant primary dealers.  Later in the month, *Bloomberg* reported more extensively on the investigation, finding that some of the traders at the primary dealers "have the opportunity to learn specifics of those bids hours ahead of the auctions."[29]  More specifically, "[t]raders at some of these dealers also have talked with counterparts at other banks via online chatrooms" and "swapped gossip about clients' Treasury orders as recently as last year."[30]

---

[28]   Dugan, *supra* note 9.

[29]   Scaggs et al., *supra* note 6.

[30]   *Id.*

80.     The *Bloomberg* article also revealed that the Treasuries investigation grew out of the DOJ's and other regulators' investigations into collusion in and manipulation of interbank interest rates and foreign exchange trades.  As discussed further below, many of the same Defendants here pleaded guilty to currency-rigging involving allegations that "traders engaged in cartel-like behavior by sharing information, such as via chatrooms."[31]  Similar to what the DOJ discovered in connection with its criminal investigation into the foreign exchange market, Defendants' employees used electronic chat rooms and other media to share confidential information about client order flow (including information regarding demand and pricing) and bidding strategies for Treasury Securities in the when-issued market and during Treasury Department auctions so that they could maximize their gains in Treasury Securities, the secondary market for Treasury Securities and the market for Treasury Instruments, including by front-running unsuspecting investors' orders in these markets.

81.     It is, after all, an "open secret" that Treasury Securities traders employed by Defendants "can see orders flowing in."[32]  The information asymmetry between primary dealers and other market participants, along with Defendants' practice of sharing critical information about order flow and demand, gives primary dealers a unique informational advantage that allows them to assess and anticipate their own exposure, predict price movements and execute trades in Treasury markets, including during auctions, in the when-issued and secondary markets, and in the markets for Treasury Instruments, that benefit their positions to the detriment of other investors, including plaintiff and Class members.

82.     Information about auction demand, after all, is material and has a direct impact on the prices of Treasury Securities when disclosed.  As noted in one academic article, "[i]t is generally

---

[31]     *Id.*

[32]     *Id.*

accepted that the fundamental valuation of government securities typically does not involve significant amounts of private information," although "the price of any given issue can be strongly affected by demand, and information about demand may be privately held by auction participants."[33] As discussed herein, Defendants, as primary dealers in Treasury auctions, each have access to a part of that demand. When combined, this information serves as a critical tool that Defendants have used to manipulate the prices of Treasury auctions, Treasury Securities and Treasury Instruments.

83.     As reported by *Bloomberg*, in fact, people familiar with several of the primary dealer Defendants have stated that "[b]ankers have often shared broad guidance, both internally and to clients, on whether demand is slack or strong before auctions."[34] Additionally, although many banks have rules prohibiting employees from discussing yields or sizes of client bids before auctions, "[i]n many cases, such guidelines aren't always followed, monitored or enforced."[35] At defendants BNP Paribas and Cantor Fitzgerald, for example, there "isn't a consistent understanding among traders and salespeople about whether they can share information about orders before auctions," according to individuals familiar with each of these Defendants.[36] At Societe Generale (the parent for defendant SG), "traders [of Treasury Securities] can get a pre-auction rundown of customers' level of interest."[37]

84.     In response to revelations that foreign exchange traders used chat rooms to manipulate the foreign exchange market, certain defendants recently prohibited their traders from

---

[33]   Pegaret Pichler & Alex Stomper, *Primary Market Design in the Presence of When-Issued Markets* 5-6 (Jan. 2, 2011), http://papers.ssrn.com/S013/papers.cfm?abstract-id=1734020.

[34]   Scaggs et al., *supra* note 6.

[35]   *Id.*

[36]   *Id.*

[37]   *Id.*

using electronic multibank chat rooms, including defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman, JPMorgan, Morgan Stanley, RBS and UBS. Likewise, a spokesman for defendant SG's parent Societe Generale confirms that it now "specifically prohibit[s] the sharing of any information about customer auction orders ahead of Treasury auctions," and that "[c]ustomer auction orders are not shared outside the desk responsible for the auctions and related sales personnel."[38]

85.     Further yet, in connection with its investigation into the manipulation of the ISDAFix benchmark by many of the same defendants named herein, the CFTC recently found that Barclays traders used Treasury Securities as part of their manipulative scheme to move reference rates and spreads that influence ISDAFix. In its Order making findings and imposing a $115 million fine on Barclays, the CFTC concluded that "Barclays traders also discussed, and on at least a few occasions attempted, manipulation through other means, including bidding, offering, and/or executing trades in U.S. Treasuries on Swaps Broker's electronic bond trading platform (for 2-year through 30-year maturities)."[39]

86.     Rather than competing in the bidding process to determine a competitive market price for Treasury Securities, Defendants, in the hours prior to the auction, shared with each other valuable competitively sensitive client auction bidding order flow information – including information regarding client demand for Treasury Securities, sizes of clients' bids, and requested yields and discount rates – in order to influence Treasury auction results in a manner that would benefit Defendants, to the detriment of other investors in the market, including plaintiff and Class members.

---

[38]   *Id.*

[39]   *In the Matter of Barclays PLC et al.*, CFTC Docket No. 15-25, slip op. at 8 n.8 (May 20, 2015), http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfbarclaysorder052015.pdf.

Based on this shared confidential information, Defendants executed concerted bidding and/or trading strategies designed to manipulate, and which actually did manipulate, the auction of and when-issued market for Treasury Securities, the corresponding secondary market, and the market for Treasury Instruments such as Treasury futures and options.

87.     Defendants leveraged this collusively exchanged information regarding, *inter alia*, auction demand and pricing, and coordinated trading strategies to manipulate the markets for Treasury Securities and Treasury Instruments by: (1) submitting optimized bids to artificially depress Treasury auction prices and therefore artificially inflate the auction yields and discount rates resulting from such auctions; and (2) "front-running" or trading ahead of other investors in the when-issued and secondary markets for Treasury Securities and in the market for Treasury Instruments, including Treasury futures and options, in order to improve Defendants' trading positions to the detriment of other market participants, including plaintiff and Class members.

**Expert Economic Analysis Indicates Manipulation of the Treasury Markets**

88.     Plaintiff's expert economic analysts have conducted preliminary analyses of relevant trends in the Treasury markets.  These experts determined that one of the most relevant analyses is the trend in "auction tail" as a percentage of median yield.  "Tail" in an auction can be defined in two ways.  First, it can be the difference between the highest yield (or stop-out yield) of the auction used to determine the auction price and the when-issued yield just prior to the auction (this has been referred to as "market tail").  Second, it can be defined as the difference between the stop-out yield and the median yield of the accepted bids at the auction, or the auction tail.  Both are indicative of demand – the larger the tail, the weaker the demand.  However, market tail can be both positive or negative, while the auction tail is always positive or zero.

89.     The median yield reported from a Treasury auction reflects what the bidders whose bids were accepted were willing to pay in the aggregate, while the high yield reflects what they

actually paid in aggregate.  The difference, or the auction tail, reflects the discount paid to what the bidders were willing to pay – or a measure of under-pricing, or the cost of issuing debt to the Treasury Department.  If Defendants were colluding when submitting bids to minimize the auction price, for example, this may result in an increase in the auction tail.

90.    With this background, plaintiff's experts analyzed the trend in the auction tail for 5-year Treasury notes from 2003 through 2014 by looking at the auction tail as a percentage of the median yield. The graph below demonstrates that in 2008 and continuing through 2014 there was a sharp increase in the auction tail as a percentage of the median yield.



91.    Given that the auction tail also can be an indication of demand, plaintiff's experts performed numerous analyses to rule out the possibility that the increase in auction tail was simply caused by a decrease in demand starting in 2008.  First, they looked at a commonly used indication

of Treasury auction demand, the bid-to-cover ratio, which represents the amount of bids tendered divided by the amount of bids accepted. For example, if there were $90 billion of bids tendered, but only $30 billion were accepted, the bid-to-cover ratio is 3.00 (or $90 billion / $30 billion). From 2003 through 2007, the average bid-to-cover ratio for 5-year notes was 2.41, while from 2008 through 2014 it was slightly higher at 2.62. In other words, based on the bid-to-cover ratio, there was no drop in demand that could explain the increase in the auction tail as a percentage of median yield.

92.     Second, plaintiff's experts analyzed whether volatility, as measured by the standard deviation in the high, median or low yield, increased given that bid-ask spreads increased following the financial crisis. Their analysis found that no such increase in volatility could explain the increase in the auction tail as a percentage of the median yield. Third, given that plaintiff's experts analyzed auction tail as a *percentage* of the median yield, and because interest rates generally declined from 2008 going forward, they performed the same analysis without expressing it as a percentage and found similar results – *i.e.*, the auction yield still increased significantly beginning in 2008. Finally, to determine whether other Treasury notes exhibited the same or similar increases around 2008, plaintiff's experts duplicated their analysis for 2-year Treasury notes and 10-year Treasury notes. The results of these analyses were similar to those of 5-year Treasury notes.

93.     Plaintiff's experts also analyzed the relationship between auction demand and price changes for Treasury Securities in the secondary market. This effort focused on whether there was an observable impact on on-the-run Treasury Securities in the secondary market if there was strong auction demand as evidenced by the bid-to-cover ratio. Plaintiff's experts found a statistically significant relationship, meaning that private information about auction demand could be used in other markets, including the secondary market, to make profits.

94.     Plaintiff's experts' analysis, revealing an increase in auction tail during the Class Period and a significant relationship between auction demand and price changes for Treasury Securities, supports and is consistent with plaintiff's allegations that Defendants were colluding to suppress auction prices in the hours before the auction (*i.e.*, artificially inflating the auction yield or discount rate) and front-running the prices of Treasury Securities and Treasury Instruments to improve Defendants' positions at the expense of plaintiff and Class members.

**Related Governmental Investigations Expose Defendants' Collusive Conduct in Manipulating Financial Markets and Benchmarks**

95.     The DOJ's probe into the Treasury Securities market developed as an offshoot of similar probes into manipulative and collusive activity among financial institutions, including several of the Defendants, regarding various markets and indices, including LIBOR, Euribor, foreign exchange and ISDAFix.  These probes have resulted in numerous settlements and guilty pleas and have involved similar allegations of collusion through the sharing of information between banks via online chat rooms and other electronic means in an effort to manipulate prices of various financial products in those banks' favor.

96.     Numerous Defendants (or their parents and affiliates) have been implicated in and either admitted wrongdoing or pleaded guilty in connection with setting various benchmarks including, for example LIBOR and Euribor rates.  Indeed, regulators accused many of these entities of manipulating LIBOR rates by colluding and submitting deliberately false quotes for various LIBOR rates to the organization that collected dealer-bank submissions and calculated the various LIBORs.

97.     In June 2012, defendant Barclays (and its parent companies, Barclays PLC and Barclays Bank PLC) was fined over $450 million by the CFTC ($200 million), DOJ ($160 million) and the U.K.   Financial Services Authority ("FSA") ($91 million) in connection with its

- 32 -

manipulation of LIBOR and Euribor rates. Barclays had been accused of – and ultimately admitted to – manipulating LIBOR and Euribor rates routinely to make its derivatives positions more profitable and to signal the bank's health in the midst of the global financial crisis.

98.     Likewise, in December 2012, UBS AG (the parent of defendant UBS) and a Japanese subsidiary agreed to pay regulators a total of $1.5 billion in fines for LIBOR rate manipulation. The fines include a $400 million penalty as part of a non-prosecution agreement between UBS AG and the DOJ, requiring the company to continue cooperating with the DOJ in its investigation, and a $700 million penalty handed down by the CFTC for UBS AG and its subsidiary's role in manipulating LIBOR. In its order imposing the fine, the CFTC found: (1) that the companies, over the course of six years, "regularly tried to manipulate multiple benchmark interest rates for profit, and at times succeeded in manipulating the official fixing of Yen LIBOR"; (2) "[m]ore than 2,000 instances of unlawful conduct involving dozens of UBS employees, colluding with other panel banks, and inducing interdealer brokers to spread false information and influence other banks"; and (3) "UBS made false U.S. Dollar LIBOR and other submissions to protect its reputation during the global financial crisis."[40]

99.     In February 2013, RBS and its wholly-owned subsidiary RBS Securities Japan Ltd. agreed to pay $150 million in criminal fines to the DOJ for its role in manipulating LIBOR. This was on top of $462 million in regulatory penalties and disgorgement imposed by the CFTC and the U.K.'s FSA. As part of a deferred prosecution agreement with the government, the DOJ charged RBS with criminal price-fixing in violation of the Sherman Act for its participation in a conspiracy to rig LIBOR rates with other banks. According to the deferred prosecution agreement, "at various

---

[40]   Press Release, U.S. Commodity Futures Trading Commission, *CFTC Orders UBS to Pay $700 Million Penalty to Settle Charges of Manipulation, Attempted Manipulation and False Reporting of LIBOR and Other Benchmark Interest Rates* (Dec. 19, 2012), http://www.cftc.gov/PressRoom/PressReleases/pr6472-12.

times from at least 2006 through 2010, certain RBS Yen and Swiss Franc derivatives traders – whose compensation was directly connected to their success in trading financial products tied to LIBOR – engaged in efforts to move LIBOR in a direction favorable to their trading positions."[41]

100.     Additionally, in December 2013, the European Commission fined Deutsche Bank, RBS, JPMorgan, Citigroup, Societe Generale and one other bank approximately $2.3 billion in connection with rigging various LIBOR and Euribor rates.  UBS and Barclays only avoided fines because they revealed the existence of the cartel to authorities.

101.     Deutsche Bank was also recently fined a total of over $2.5 billion in penalties by various regulators, including the DOJ, CFTC, New York Department of Financial Services ("DFS") and the U.K.'s Financial Conduct Authority ("FCA") in connection with its manipulation of U.S. Dollar LIBOR and participation in a price fixing conspiracy to rig Yen LIBOR.  The fines included a $625 million penalty levied by the DOJ in connection with a deferred prosecution agreement in which the bank admitted to violating the Sherman Act.  Assistant Attorney General Leslie R. Caldwell described the conduct as follows: "For years, employees at Deutsche Bank illegally manipulated interest rates around the globe – including LIBORs for U.S. Dollar, Yen, Swiss Franc and Pound Sterling, as well as EURIBOR – in the hopes of fraudulently moving the market to generate profits for their traders at the expense of the bank's counterparties."[42]

---

[41]   Press Release, U.S. Department of Justice, *RBS Securities Japan Limited Agrees to Plead Guilty in Connection with Long-Running Manipulation of Libor Benchmark Interest Rates* (Feb. 6, 2013), http://www.justice.gov/opa/pr/rbs-securities-japan-limited-agrees-plead-guilty-connection-long-running-manipulation-libor.

[42]   Press Release, U.S. Department of Justice, *Deutsche Bank's London Subsidiary Agrees to Plead Guilty in Connection with Long-Running Manipulation of LIBOR* (Apr. 23, 2015), http://www.justice.gov/opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running-manipulation.

102.   Many of these same Defendants, including Barclays, HSBC, UBS, Citigroup, JPMorgan and RBS (or their parents or subsidiaries), were also recently the subjects of several investigations that have resulted in substantial fines stemming from their conspiracy to manipulate foreign exchange benchmarks and fix the bid-ask spreads on foreign exchange transactions.

103.   For example, in May 2015, Citicorp, JPMorgan Chase & Co., Barclays PLC and The Royal Bank of Scotland plc pleaded guilty "to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere," and agreed to pay criminal fines totaling over $2.5 billion.[43]   Barclays agreed to pay a separate fine for violating a June 2012 non-prosecution agreement resolving the DOJ's investigation of LIBOR and other benchmark interest rate manipulation. According to the plea agreements:

> [B]etween December 2007 and January 2013, euro-dollar traders at Citicorp, JPMorgan, Barclays and RBS – self-described members of "The Cartel" – used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates. . . . "The Cartel" traders coordinated their trading of U.S. dollars and euros to manipulate the benchmark rates set at the 1:15 p.m. and 4:00 p.m. fixes in an effort to increase their profits."[44]

*Id.*

104.   Although UBS AG avoided a guilty plea as to its conduct in the foreign exchange market by receiving conditional immunity for cooperating in the government's probe, it pleaded guilty in May 2015 to manipulating LIBOR and other benchmark interest rates and agreed to pay a $203 million criminal penalty.  In the factual statement attached to UBS AG's plea agreement, the DOJ found that the company engaged in deceptive foreign exchange trading and sales practices after

---

[43]   Press Release, U.S. Department of Justice, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015), http://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.

[44]   *Id.*

it signed the LIBOR non-prosecution agreement.  UBS AG admitted that it conspired with other firms acting as dealers in the foreign exchange spot market by

> agreeing to restrain competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere . . . by, among other things: (i) coordinating the trading of the EUR/USD currency pair in connection with ECB and WMR benchmark currency "fixes" . . . , and (ii) refraining from certain trading behavior, by withholding bids and offers, when one conspirator held an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position.[45]

105.    In connection with its foreign exchange investigation, the Federal Reserve also announced in May 2015 that it was imposing on these same five banks fines of over $1.6 billion. Likewise, Barclays settled related claims with the New York's DFS, the CFTC and the U.K.'s FCA for an additional combined penalty of approximately $1.3 billion.

106.    The CFTC levied $1.4 billion in fines on Citibank N.A., HSBC Bank plc, JPMorgan Chase Bank N.A., The Royal Bank of Scotland plc and UBS AG in connection with settling charges of attempting to manipulate, and for aiding and abetting other banks' attempts to manipulate, foreign exchange benchmark rates to benefit the positions of certain traders.  In connection with the probe, the CFTC found that certain traders at the banks

> coordinated their trading with traders at other banks in their attempts to manipulate the FX benchmark rates, including the 4 p.m. WM/R fix.  FX traders at the Banks used private chat rooms to communicate and plan their attempts to manipulate the FX benchmark rates.  In these chat rooms, FX traders at the Banks disclosed confidential customer order information and trading positions, altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates.  These chat rooms were sometimes exclusive and invitation only.[46]

---

[45]    Plea Agreement, *United States of America v. UBS AG* (D. Conn. May 20, 2015) at Ex. 1 ¶ 15, http://www.justice.gov/file/440521/download.

[46]    Press Release, U.S. Commodity Futures Trading Commission, *CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates* (Nov. 12, 2014), http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

107.     Altogether, regulators around the globe levied nearly $9 billion in fines and penalties to defendants Barclays, Citigroup, JPMorgan, RBS and UBS (or their affiliates and/or parents) alone for their conduct in the foreign exchange spot market.

108.     In addition to the LIBOR and foreign exchange investigations, many of the Defendants have been subject to a CFTC investigation involving attempts to manipulate the U.S. Dollar ISDAFix, a global benchmark for interest rate products.  In May 2015, the CFTC fined defendant Barclays (and its parent companies, Barclays PLC and Barclays Bank PLC) $115 million for manipulating ISDAFix.  The CFTC found that certain Barclays traders bid, offered, and executed transactions at the critical 11:00 a.m. fixing time to affect the reference rates and the published ISDAFix.  The CFTC uncovered emails and audio recordings demonstrating that when Barclays had derivatives positions settling or pricing against ISDAFix, its traders discussed their intent to move ISDAFix in whichever direction benefitted their positions. *The Wall Street Journal* reported in June 2015 that the CFTC was nearing settlements with several other banks involved in setting the ISDAFix benchmark, a panel of banks that also includes the parents or affiliates of defendants BNP Paribas, Citigroup, Deutsche Bank, Goldman, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS and UBS.

**Equitable Tolling of the Statutes of Limitations Due to
Defendants' Fraudulent Concealment**

109.     Defendants actively and effectively concealed their collusion, as alleged herein, from plaintiff and members of the Class.  As a result of Defendants' concealment, all applicable statutes of limitations affecting plaintiff's and the Class's claims have been tolled.

110.     Defendants' conspiracy was by its very nature secretive and self-concealing. Defendants engaged in a form of collusion and market manipulation, which is inherently self-concealing and could not be detected by plaintiff or members of the Class. The secret nature of

Defendants' conspiracy – which relied on non-public methods of communication, such as secure websites and chat rooms, to conceal their agreements to manipulate the auction of Treasury Securities and the trading of Treasury Securities and Treasury Instruments – prevented plaintiff from uncovering Defendants' unlawful conduct.

111.    Moreover, Defendants actively conspired to conceal their unlawful conduct. Throughout the Class Period, Defendants actively and jointly undertook strategies designed to conceal their collusive conduct by, for example, communicating via electronic chat rooms so as to prevent their conspiracy from being uncovered.

112.    Due to Defendants' efforts to conceal their collusive conduct, plaintiff could not, through the exercise of reasonable diligence, have learned of facts indicating that Defendants were colluding to manipulate Treasury Securities and Treasury Instruments until June 2015 at the earliest, when news sources first reported that the DOJ was investigating the Treasury Securities market.

113.    Additionally, even after investigations into the LIBOR and foreign exchange scandals cast a spotlight on some of Defendants' unlawful activities, Defendants did not fully break ranks, but instead continued to conspire to manipulate Treasury Securities and Treasury Instruments and engaged in ongoing efforts to keep their collusion hidden.

114.    As a result of the self-concealing nature of the conspiracy, the active steps taken by Defendants to fraudulently conceal their conspiracy, and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for plaintiff's and the Class's claims.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action on behalf of itself and others similarly situated as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

All persons or entities who, between January 1, 2008 and June 8, 2015 (the "Class Period"), purchased or sold bills, bonds, notes, TIPS, FRNs and/or other marketable securities issued by the U.S. Department of Treasury, and all persons or entities who purchased or sold futures, options, or other derivatives based on or otherwise tied to such bills, bonds, notes, TIPS, FRNS and/or other marketable securities issued by the U.S. Department of Treasury during the Class Period.

Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the U.S. Government.

116.   Plaintiff believes there are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class members is impracticable.

117.   There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for Treasury Securities and Treasury Instruments in violation of the Sherman Act;

(b)     Whether Defendants breached their fiduciary duties to the Class;

(c)     The identity of the participants in the conspiracy;

(d)     The duration of the conspiracy;

(e)     The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(f)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused cognizable legal injury to the business or property of plaintiff and the Class members;

(g)     Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from plaintiff and the Class members;

- 39 -

(h)     Whether Defendants' conduct violated the Commodity Exchange Act;

(i)     Whether Defendants were unjustly enriched at the expense of plaintiff and the Class;

(j)     Whether Defendants breached their duty of good faith and fair dealing with the Class;

(k)     The appropriate injunctive and equitable relief for the Class; and

(l)     The appropriate measure of damages sustained by plaintiff and the Class members.

118.    During the Class Period, plaintiff purchased Treasury Securities and/or Treasury Instruments at prices that were manipulated by Defendants, and their interests are not antagonistic to those of the other members of the Class.  Plaintiff is a member of the Class; has claims that are typical of the claims of the other Class members; and will fairly and adequately protect the interests of Class members.  Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class members.  Additionally, plaintiff is represented by counsel who are competent and experienced in the prosecution of class action litigation, including antitrust and commodities class action litigation.

119.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

120.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly

situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust and Commodity Exchange Act violations. This class action presents no difficulties of management that would preclude its maintenance as a class action.

### COUNT I

#### Conspiracy to Restrain Trade in Violation of §1 of the Sherman Act, 15 U.S.C. §1 *et seq.*

122.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

123.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1 *et seq*.

124.    During the Class Period, Defendants were competitors in the market for Treasury Securities and Treasury Instruments, including Treasury futures and options on Treasury futures traded on the CBOT. Defendants nonetheless shared with each other competitively sensitive information, including client auction bidding order flow and their intended desires for the direction of price movements in Treasury auctions and the markets for Treasury Securities and Treasury Instruments, and worked collectively to move prices in the direction they desired, to the detriment of plaintiff and members of the Class.

125.    Likewise, Defendants' collusive, manipulative, anticompetitive, and unlawful sharing of competitively sensitive data, such as client auction bidding order flow, demand for Treasury

Securities and Defendants' respective desires for the direction of price movements in auctions of Treasury Securities and the markets for Treasury Securities and Treasury Instruments, allowed Defendants to trade ahead of plaintiff and members of the Class who purchased and sold U.S. Treasury Securities in the secondary market and/or Treasury Instruments.

126.    Additionally, Class members who purchased or sold Treasury Instruments were also harmed by Defendants' collusive conduct, as the prices of those instruments were tied to the prices of Treasury Securities, which, due to Defendants' coordinated, manipulative, anticompetitive, and unlawful conduct, did not reflect actual market rates.

127.    This conspiracy to manipulate the prices of Treasury Securities caused injury to both plaintiff and the Class by depriving them of the benefit of accurate Treasury Securities prices reflecting actual market conditions.  Therefore, plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

128.    The conspiracy is a *per se* violation of §1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Treasury markets.  There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

129.    As a direct, material and proximate result of Defendants' violation of §1 of the Sherman Act, plaintiff and the Class have been injured in their business and property, within the meaning of §4 of the Clayton Act, throughout the Class Period.

130.    Plaintiff and members of the Class are entitled to treble damages for the violations of the Sherman Act under §4 of the Clayton Act.

131.    Plaintiff and the Class are also entitled to an injunction against Defendants, preventing and restraining the violations alleged above, under §16 of the Clayton Act.

## COUNT II

### Manipulation in Violation of the
### Commodity Exchange Act, 7 U.S.C. §1 *et seq.*

132.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

133.    By their manipulative acts detailed herein, Defendants specifically intended to, and did in fact, manipulate prices of exchange-traded Treasury Instruments, including Treasury futures and options traded on the CBOT, in violation of §§6(c) and 9(a) of the Commodity Exchange Act, 7 U.S.C. §§9 and 13(a), and 17 C.F.R. §§180.1 and 180.2 promulgated thereunder.

134.    Defendants had the ability to manipulate the prices of Treasury Instruments given their privileged position as primary dealers of Treasury Securities and as a result of their significant market power and roles as market makers.  Consequently, Defendants had the ability to influence prices of Treasury Instruments, including Treasury futures and options traded on the CBOT.

135.    Defendants intended that their unlawful conduct would result in the prices of exchange-traded Treasury Instruments being artificial during the Class Period.

136.    As a result of Defendants' unlawful conduct, Defendants caused the prices of exchange-traded Treasury Instruments to be artificial during the Class Period.

137.    Plaintiff and members of the Class who transacted in Treasury Instruments during the Class Period did so at artificial prices resulting from Defendants' manipulation in violation of the Commodity Exchange Act.

138.    Defendants are liable for damages under §22 of the Commodity Exchange Act, 7 U.S.C. §25.

## COUNT III

### Principal-Agent Liability in Violation of the
### Commodity Exchange Act, 7 U.S.C. §1 *et seq.*

139.     Plaintiff incorporates by reference the preceding paragraphs and allegations.

140.     Each of the Defendants is liable under §2(a)(1)(B) of the Commodity Exchange Act, 7 U.S.C. §2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

141.     Plaintiff and Class members are each entitled to actual damages sustained for the violations of the Commodity Exchange Act alleged herein.

## COUNT IV

### Aiding and Abetting in Violation of the
### Commodity Exchange Act, 7 U.S.C. §1 *et seq*

142.     Plaintiff incorporates by reference the preceding paragraphs and allegations.

143.     Each of the Defendants is liable under §13 of the Commodity Exchange Act, 7 U.S.C. §13c, as a principal violator of the Commodity Exchange Act due to each of the Defendants' willful aiding, abetting, counseling, commanding, and/or inducing of the violations of the Commodity Exchange Act described herein.

144.     Each of the Defendants is further liable under §13 of the Commodity Exchange Act, 7 U.S.C. §13c, as a principal violator of the Commodity Exchange Act due to each of the Defendants' actions in combination or concert with the other Defendants in order to effect the violations of the Commodity Exchange Act described herein.

145.     As a result of Defendants' liability for their aiding and abetting of the violations described herein, and for the unlawful conduct of their co-conspirators, Defendants are liable for damages pursuant to §22 of the Commodity Exchange Act, 7 U.S.C. §25.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

146.     Plaintiff incorporates by reference the preceding paragraphs and allegations.

147.     Defendants and members of the Class entered into bilateral contracts for the purchase and/or sale of Treasury Securities in the when-issued and secondary markets, and of Treasury Instruments such as Treasury futures and options traded on the CBOT.  Implied in these agreements were covenants that the counterparties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of their respective agreements.  Also implied was a promise by the Defendants, as primary dealers in Treasury Securities and market makers for both Treasury Securities and Treasury Instruments, that the price of the Treasury Securities and Treasury Instruments would not be manipulated to the Defendants' benefit and Class members' detriment.

148.     Defendants failed to perform their obligations in good faith under these agreements by knowingly, intentionally, and secretly conspiring to manipulate Treasury Securities to either reduce the payments they would have to make or to increase the payments they were entitled to receive at the expense of plaintiff and Class members.  At the very least, Defendants acted with reckless disregard for the interests of plaintiff and Class members.

149.     As Defendants knew, their manipulation of the prices of Treasury Securities and Treasury Instruments deprived plaintiff and Class members of the benefit of their bargain.  Had the Defendants not engaged in such manipulation, plaintiff's and Class members' transactions in Treasury Securities and Treasury Instruments would have been more profitable or losses on those transactions would have been lower. As a direct and proximate result of Defendants' knowing, intentional, and bad faith violation of their agreements' implied covenants of good faith and fair dealing, plaintiff and members of the Class have suffered damages in an amount to be determined at

trial. Plaintiff and members of the Class seek all losses caused by Defendants' manipulation, including loss of interest, lost profits and all losses on their Treasury Securities, Treasury Instruments and other financial instruments that they transacted in with Defendants

## COUNT VI

### Unjust Enrichment

150.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

151.    Defendants benefited financially from their extensive unlawful acts described herein, including but not limited to working in concert with each other to manipulate the prices of Treasury Securities and Treasury Instruments, including Treasury futures and options. These unlawful acts caused plaintiff and other members of the Class to suffer injury, lose money and transact in Treasury Securities and Treasury Instruments at artificial prices.

152.    As a direct result of the foregoing, it would be inequitable and unjust for Defendants to be permitted to enrich themselves in this manner.

153.    Each of the Defendants, in equity and good conscience, should be required to pay restitution of its own unjust enrichment to plaintiff and members of the Class.

154.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

### PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff is designated as a class representative, and that plaintiff's counsel is appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate §1 of the Sherman Act;

C.      That Defendants are permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint and that the Court direct such other equitable relief as may be appropriate;

D.      That the Court award plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

E.      That the Court find that Defendants violated the Commodity Exchange Act and award appropriate damages;

F.      That the Court award plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

G.      That the Court directs such further relief it may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

DATED:  September 4, 2015            ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     VINCENT M. SERRA


                                         *s/Samuel H. Rudman*
                                     ─────────────────────────
                                         SAMUEL H. RUDMAN

                                     58 South Service Road, Suite 200
                                     Melville, NY  11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)
                                     srudman@rgrdlaw.com
                                     vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
BRIAN O. O'MARA
RANDI D. BANDMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davem@rgrdlaw.com
bomara@rgrdlaw.com
randib@rgrdlaw.com

Attorneys for Plaintiff